IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 6, 2025 Session

**IN RE SKYLER M.**

**Appeal from the Circuit Court for Davidson County**
**No. 21A26    Stanley Kweller, Judge**

_____

**No. M2024-00960-COA-R3-PT**

_____

Mother appeals the trial court's findings that (1) termination of Mother's parental rights is supported by the grounds of persistence of conditions, mental incompetence, and failure to manifest an ability and willingness to assume custody, and (2) termination is in the child's best interest. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, P.J., M.S., and ANDY D. BENNETT, J., joined.

Nick Perenich, Nashville, Tennessee, for the appellant, Loren M.

Wende J. Rutherford, Nashville, Tennessee for the appellees, Abigail Christine Bargatze Ray, and Adron Wayne Ray, III.

Jonathan Skrmetti, Attorney General and Reporter; Amber L. Barker, Senior Assistant Attorney General, Solicitor General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

## I. FACTUAL AND PROCEDURAL BACKGROUND

This matter involves the termination of the parental rights of Respondent/Appellant Loren M.[1] ("Mother") to her son Skyler M., born in June 2020. Petitioner/Appellee the

---

[1] In cases involving the potential termination of parental rights, it is this Court's policy to remove

Tennessee Department of Children's Services ("DCS") removed the child from Mother's care on September 11, 2020, based on concerns that the child was not being properly supervised,[2] that there was domestic violence between Mother and her boyfriend, and that Mother's whereabouts were unknown. The child was placed with a foster family. DCS subsequently filed a petition in the Davidson County Juvenile Court ("the juvenile court"), alleging that the child was dependent and neglected, and seeking an emergency protective custody order. On September 15, 2020, the juvenile court entered an emergency protective custody order, finding probable cause to believe that the child was dependent and neglected and subject to an immediate threat of harm, and placing the child in DCS custody.

Petitioners/Appellees Adron R. ("Foster Father") and Abigail R. ("Foster Mother," and together with Foster Father, "Foster Parents"), filed a petition to terminate Mother's parental rights and to adopt the child in the Davidson County Circuit Court ("the trial court") on April 8, 2021.[3] As grounds for termination, Foster Parents raised (1) persistence of conditions, (2) substantial noncompliance with a permanency plan, (3) mental incompetence, and (4) failure to manifest an ability and willingness to assume custody of the child. Foster Parents alleged that terminating Mother's parental rights was in the child's best interest. By order of May 19, 2021, the trial court added DCS as a co-petitioner and bifurcated the termination and adoption matters raised in the petition. Subsequently, the trial court appointed a Guardian ad Litem ("GAL") for the child.

The sister of Mother's boyfriend, "Little Angela,"[4] moved to intervene in the adoption case in June 2021. Little Angela alleged that Foster Parents' petition was filed to prevent DCS from placing the child into her custody on Mother's request. Little Angela further alleged that Mother was mentally incompetent and needed her own GAL. The trial court denied Little Angela's motion to intervene based on her lack of standing. Little Angela was named Mother's conservator by the Maury County Chancery Court in April 2022; Little Angela's right to defend lawsuits on Mother's behalf was later removed to enable Mother to receive court-appointed counsel.

The matter was eventually heard on April 16 and 17, 2024. The two main themes of the testimony were the child's particular needs and Mother's mental and physical limitations. The child has been diagnosed with Level 3 autism and, by all accounts, has a serious inability to tolerate change. The child, at almost four years old, is also nonverbal and not potty-trained. Mother explained that she is mildly intellectually disabled, which

the full names of children and other parties, to protect their identities.

[2] Specifically, the petition indicated that a referral had been made that the child had been left outside a motel while Mother was inside, and that the child was sunburnt and had been choking after being provided spoiled milk.

[3] An amended petition was filed on April 9, 2021.

[4] Both Little Angela and her mother, "Big Angela," testified at trial. As the women share the same full name, all parties have used the "Big" and "Little" identifiers throughout this case. This Court means no disrespect in continuing this practice or in referring to other witnesses by first name.

makes it difficult for her to do certain things or to understand things she is told on occasion, but does not prevent her from living independently.

Foster Mother explained that Foster Parents have maintained custody of the child since September 2020. Foster Mother stated that when the child came into their custody, he was very thin, hungry, and sunburnt, and suffering from severe fungal infections and dry skin, which required medical treatment. Foster Parents brought the child in for testing shortly before his second birthday, as they believed the child was not meeting age-appropriate milestones. The child was diagnosed with autism in May 2022.

Around the same time, Foster Parents were informed that without surgical intervention to correct it, the child's lazy eye would go blind. Foster Mother explained that it took several appointments to convince Mother to consent to the surgery. Mother and Foster Mother were permitted to see the child shortly after surgery, on the condition that they would not touch the child's eye. Foster Mother testified that, despite being present when the risks were explained, Mother attempted to wipe the child's eye with noticeably dirty hands. Additional precautions were taken to prevent such conduct after the child's second surgery.

Foster Mother described life with the child as "rewarding and very difficult at the same time." She explained the changes Foster Parents have made to their lives to accommodate the child's disability, including changing their schedules to ensure that the child is supervised at all times, and making renovations to their home to provide a therapy room, pool, and playground for the child, as well as additional locks and fences to keep the child safe. Foster Mother testified that they have applied for grants to cover specific expenses, like a communication tablet and a safety bed, that are not covered or only partially covered by insurance.

Foster Mother's family assists in caring for the child and bringing him to and from therapy when Foster Parents are at work. Foster Mother described herself, her mother, her aunt, and Foster Father as the child's "core four" caretakers, but explained that the child is particularly attached to her. Foster Mother testified that the child has a strong relationship with Foster Parents' teenage son and is slowly being introduced to other family members.

Foster Mother testified that Mother calls roughly ten times a week, with Foster Parents answering approximately eighty percent of the calls, but always answering on Tuesdays and Thursdays. Foster Mother stated that Foster Parents worry about Mother's ability to meet her own needs and have attempted to take care of her as much as they can, including ensuring that she has food and transportation. Foster Mother testified to Foster Parents' belief that the child and Mother are "a package deal[,]" and their intent to maintain a positive relationship with Mother if allowed to adopt the child.

Foster Mother explained the importance of consistency and stability for the child.

She testified to the attention, patience, self-regulation, and research required in ensuring the child's mental, physical, and emotional needs are met without being able to communicate directly with him. Foster Mother stated that she has not seen any indication that Mother has attempted to learn about autism or the needs of an autistic child. Moreover, Foster Mother explained that Mother does not seem to understand the severity of the child's condition. For example, Mother continues to ask Foster Parents daily whether the child has spoken and cries when they say he has not, despite the unlikelihood that he will ever do so. She opined that it would be "devastating" for the child and "change his life for the worse" to be removed from Foster Parents' home and his routine.

The child began behavioral therapy in 2022 and currently attends therapy for two or three hours per day, five days a week. The child's therapist, Jasmine James, testified that consistency is especially important to the child, with even small changes resulting in "increased tantruming during that time." The child's tantrums involve prolonged screaming and thrashing about. Occasionally, a change in schedule or to clinic staff results in such distress that Ms. James is unable to provide effective therapy and sends the child home. Ms. James opined that handling the child's tantrums will only become more difficult as he ages and grows.

Part of the difficulty in resolving the child's tantrums results from his inability to communicate his needs. Ms. James explained that the child has been presented with several communication methods and devices, but his only consistent form of communication is the single sign language phrase, "all done."[5] Ms. James stated that the child still wears diapers and has not shown any of the prerequisites to begin potty-training.

The child's other maladaptive behaviors include putting things in his mouth and running away. Ms. James explained that during a two-hour period, the child may make more than thirty attempts to put objects into his mouth, requiring staff to be within arm's reach of him at all times. The child has also begun running away without notice or cause, including attempts to run toward the exit. Ms. James opined that it is "very important" for the child's caregiver to be mobile and able to run after him to prevent these escapes. She explained that these concerns have been discussed with Foster Parents, who have put additional precautions in place to maintain the child's safety. Ms. James conceded that she has not met with Mother.

Ms. James testified that the child loves Foster Parents and is excited to see them after a therapy session. She opined that a change in caregiver "would be extremely traumatic" and "extremely difficult" for the child and could cause "regression in his progress[.]" Ms. James testified that the child was noticeably less able to participate in therapy after he missed a session for visitation with Mother. She also noted that the child

---

[5] During their testimony, Foster Parents mentioned that the child has said a few words, used some other sign language phrases, and made his needs known through other indirect means.

had made "a lot of progress" in his motor skills and ability to self-regulate during the months prior to trial, when visitation was paused due to Mother's hospitalization and his therapy sessions were more consistent.[6]

Ultimately, Ms. James opined that the child will likely need behavioral therapy throughout his life, as well as speech therapy and eventually occupational therapy. She testified that the child needs a caregiver who is consistent, patient, and attentive, and who will implement the techniques and skills learned in therapy at home. While Ms. James stated that she could provide any caregiver with instructions or modeled behavior, if the parent is unable to also model that behavior outside of the clinical setting, the effectiveness of the therapy would be reduced.

Keonte Henry testified that she began supervising the child's therapeutic visitations with Mother in August 2022. Ms. Henry explained that her role is to model parenting skills and help visiting parents build a bond with their children, with the goal of readying the parent to perform the parenting skills without assistance. Ms. Henry testified that she informed Mother of the importance of keeping a close watch on the child to prevent him from running off or putting things in his mouth. She explained, however, that Mother was unable to do so without prompting, despite weekly visits for more than one year.[7] In particular, Ms. Henry testified that Mother failed to prevent the child from putting his hand in his diaper and then his mouth while changing his diaper on multiple occasions. Ms. Henry opined that Mother could not safely watch the child without supervision.

Ms. Henry acknowledged that she had not received any additional training for modeling parenting skills to an intellectually disabled parent. But she explained that she attempted to accommodate Mother's disability by explaining the proper skills in multiple ways. Ms. Henry stated that there had been visits where she was required to model the same behavior for Mother multiple times, as well as visits where she was required to model the same behavior from the previous visit. Accordingly, Ms. Henry did not feel that Mother was gaining any long-term benefits from her instructions. She also did not observe any intuitive parenting skills from Mother, in terms of understanding the child's needs before he expressed them.

Ms. Henry stated that while there appears to be a "good bond" between the child and Mother, the child will occasionally seem more closely bonded with herself than with Mother. When dysregulated during visits, the child will seek out Ms. Henry rather than Mother. Ms. Henry stated that there is a positive relationship between the child and Foster Parents, with the child "very attached" to Foster Parents and more reticent to leave them

---

[6] When asked whether these changes could be related simply to the child's age and the culmination of all the therapy he has received, Ms. James testified that "[t]here was a pretty dramatic shift . . . when those visits stopped occurring. It was pretty black and white."

[7] Ms. Henry testified that for some of the times Mother needed prompting, Mother had been distracted by her phone and was not paying attention to the child.

than Mother.

Mother's three older children were removed from her care prior to Skyler's birth. Mother's oldest daughter is in the custody of Mother's aunt, and her younger daughter has been adopted outside of the family. Mother shares joint custody of her older son Michael with his father's step-father, Ray B.[8] Michael does not live with Mother; Michael lives with Ray occasionally, but primarily with Little Angela, who homeschools him.

Mother and the child lived with Ray for a period of time after the child was born; they soon moved out of Ray's home because he would not allow Artwell to live there, and Mother wanted to live with Artwell. Mother and the child were briefly homeless. She and the child were living with Artwell in a motel at the time that the child was removed from her custody. Mother admitted that there had been many instances of domestic violence against her by Artwell. Most recently, Artwell pleaded guilty to aggravated assault against Mother in April 2021. After that, Mother again lived with Ray for a while before getting an apartment of her own. Mother testified that she had attempted to make things work with Artwell, but would no longer allow him around her children.[9]

Mother explained that she had been struck by a car in November 2023. At the time of trial, she was unable to walk, go to the bathroom, or bathe by herself. She was using a wheelchair and living in a rehabilitation center. Mother stated that she was unsure how long she would need to remain in the rehabilitative housing, but that she anticipated needing a ramp built before she could return home. Mother denied any intent to live with Big Angela or Little Angela following her release. Although she now lives alone in a two-story townhome where both bedrooms are located on the second floor, Mother indicated that she had not made any arrangements for accommodating her inability to climb stairs upon her discharge. She explained that if she was granted custody of the child, he would have to live with Little Angela until she had fully recovered.

When asked about the child's autism, Mother stated that "Sky can't talk" and "[w]hen he was born he had a lazy eye." And when asked whether she was concerned that the child is nonverbal, Mother stated, "My son is going to be famous one day."

During her testimony, Mother discussed the functional parenting assessment she completed with a licensed psychological examiner in April 2021, as part of the permanency plan created by DCS. In the parenting assessment, which was submitted into evidence, the

---

[8] Michael's father is Artwell M., the son and brother of Big Angela and Little Angela, respectively, Ray's step-son, and Mother's boyfriend. Artwell is not Skyler's father. Skyler's biological father is not involved with Mother, the child, or this appeal.

[9] Mother denied having any contact with Artwell after his 2021 arrest and imprisonment, but Foster Mother testified that she heard Artwell's voice during a phone call with Mother on multiple occasions and as recently as December 2023. The trial court specifically found Foster Mother's testimony on this issue to be credible.

examiner, James Proffitt, stated that Mother scored in the "mildly mentally deficient" range on two out of three tests and in the "borderline" range on the third. These scores were "considered to be valid" and "consistent with [Mother's] conversational abilities." Mr. Proffitt noted Mother's repeated "[d]efensiveness about her abilities and attempted control of her by others[.]" Ultimately, the examiner opined:

> She does not appear capable of parenting independently due to cognitive limitations and emotional instability. If possible, she should remain a presence in her children's lives under the arrangement proposed by [Little Angela] and her mother[, i.e., having Michael and Skyler live with Little Angela]. Such a framework would provide stability and adequate supervision while maintaining elements of the maternal bond. Any parenting education should be through modeling.

Mother understood Mr. Proffitt's recommendation to be that she "need[s] a whole lot of help" with the child. Mother stated that her provision of care for Michael indicates her ability to parent Skyler. She explained that she has a lot of help in caring for Michael, including from Big Angela, Little Angela, and Ray. She testified that she can safely parent Skyler with this help from her family.

Little Angela testified regarding her involvement in Mother's life, noting that she mostly provides stability for Michael. She explained that she does not really "help [Mother] to do anything physically[,]" but will "kind of help [Mother] determine what's best sometimes in a situation." Little Angela stated that she would trust Mother with the child alone for short periods. She explained that while the plan was originally for Mother to have custody of the child and live independently, changes were being considered as a result of Mother's injury. At the time of trial, Little Angela was contemplating moving in with Mother to care for her full-time and help with the child. Her intent is to "help [Mother] be a mother as much as [she] can." As to the child's needs and disabilities, Little Angela testified to her understanding that the child "needs a lot of extra support and help" and "a lot of attention and love[.]" She opined that Mother could safely co-parent Skyler with her continued involvement. Little Angela stated that it "would be a hard adjustment" for the child to be removed from Foster Parents' house, but that he would "adjust and adapt" to being with Mother.

Big Angela stated that she would "trust [Mother] an entire week to care for her children[,]" but qualified that she meant Mother's older children. She was hesitant to say whether Mother has the ability to learn new parenting skills "because [she is] not sure what Skyler's needs are[.]" In describing the plan for Mother to be able to care for the child, Big Angela explained that there were four people who could potentially move in with Mother to provide assistance; Little Angela was not included in this list. Big Angela also stated her beliefs that the child had not bonded with Foster Parents and that removing the child from Foster Parents' home "would be wonderful" for him because he would be returning to

family.

Following this proof, the trial court terminated Mother's parental rights by order of June 10, 2024. With a focus on Mother's inability to meet the child's substantial needs in light of her own impairment,[10] the trial court found that the evidence supported the grounds of (1) persistence of conditions, (2) mental incompetence, and (3) failure to manifest an ability to assume custody of the child, but not the ground of substantial noncompliance with a permanency plan. The trial court also found that termination of Mother's rights was in the best interest of the child. Mother filed a timely appeal.

## II. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). "[P]arents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *In re Carrington H.*, 483 S.W.3d at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citation omitted); *accord In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018) ("Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases.").

Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522. The standard "ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005)).

Because of the high burden of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of

---

[10] The trial court specifically stated that it "credit[ed] and relie[d] on" the parenting assessment by Mr. Proffitt, and that it found both Ms. James and Ms. Henry to be "very credible."

Appellate Procedure. As the Tennessee Supreme Court has explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).
>
> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023).

### III. ANALYSIS[11]

Any termination of parental rights appeal involves two overarching issues: whether the trial court correctly found clear and convincing evidence of at least one ground to terminate the parent's rights, and, if so, whether the court correctly found clear and convincing evidence that termination of the parent's rights is in the child's best interest. *See In re Carrington H.*, 483 S.W.3d at 525–26.

---

[11] Although the original termination petition was filed only by Foster Parents, DCS was thereafter added as a co-petitioner. In lieu of an independent appellate brief, Foster Parents filed a notice of their intent to join fully with the brief offered by DCS "as their interests are aligned and will be adequately represented." As such, we refer only to the arguments of DCS throughout our analysis.

## A. Grounds for Termination

Here, the trial court determined that clear and convincing evidence supported terminating Mother's rights on the grounds of (1) persistent conditions, (2) mental incompetence, and (3) failure to manifest an ability and willingness to assume custody. We will discuss each in turn, beginning with the mental incompetence ground, as our analysis thereunder implicates the remaining two grounds.[12]

### 1. Mental Incompetence

Under Tennessee Code Annotated section 36-1-113(g)(8)(B),[13] a parent's rights are subject to termination on the basis of mental incompetence when:

> The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future

Tenn. Code Ann. § 36-1-113(g)(8)(B)(i).[14] The mental incompetence ground "serves to protect children from harm caused by a parent who is incapable of safely caring for them." *In re Samuel R.*, No. W2017-01359-COA-R3-PT, 2018 WL 2203226, at *9 (Tenn. Ct. App. May 14, 2018) (quoting *In re Lena G.*, No. E2016-00798-COA-R3-PT, 2017 WL 2304448, at *25 (Tenn. Ct. App. May 26, 2017)). The statute specifically states that the ground does not require proof that the parent's inability to care for the child is willful. Tenn. Code Ann. § 36-1-113(g)(8)(C). Nor is a finding of mental incompetence limited to conditions that are untreatable or for which "no amount of intervention can assist." *In re Kamdyn H.*, No. E2023-00497-COA-R3-PT, 2024 WL 733317, at *10 (Tenn. Ct. App. Feb. 22, 2024) (quoting *In re S.M.R.*, No. M2008-01221-COA-R3-PT, 2008 WL 4949236, at *6 (Tenn. Ct. App. Nov. 18, 2008)), *appeal denied* (May 8, 2024), *cert. denied sub nom. Chapman v. Tenn. Dep't of Child.'s Servs.*, 145 S. Ct. 1094, 220 L. Ed. 2d 404 (2025). Instead, this ground requires proof of two essential facts: "(1) that the parent is presently unable to care for the child; and (2) that the parent is unlikely to be able to care

---

[12] The trial court did not find that the ground of substantial noncompliance with a permanency plan supported termination. Because DCS does not raise this decision as an issue on appeal, we will not review this aspect of the trial court's ruling. *See In re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *5 (Tenn. Ct. App. Mar. 8, 2023).

[13] Unless noted otherwise, we refer to the version of the statute in effect when the termination petition was filed at all times in this Opinion.

[14] The second prong of this ground requires clear and convincing evidence that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(g)(8)(B)(ii). Rather than duplicate our analysis, we confine our review of the child's best interest to subsection III. B., *infra*.

for the child in the near future." *In re B.D.M.*, No. E2022-00557-COA-R3-PT, 2023 WL 3019005, at \*14 (Tenn. Ct. App. Apr. 20, 2023) (citing *In re Joseph D.*, No. M2021-01537-COA-R3-PT, 2022 WL 16848167, at \*19 (Tenn. Ct. App. Nov. 10, 2022)).

After a thorough discussion of the evidence provided at trial, the trial court found as follows:

> Mother is intellectually impaired. The recommendations and results of the parenting assessment were that she lacks the capacity to adequately parent independently due to her cognitive limitations and emotional instability. She has been declared incompetent to manage her own affairs and a conservator has been appointed. Despite training over a long period, she has been unable to learn and demonstrate even basic parenting skills sufficient to care for Skyler and keep him safe during short visits. Notably, Skyler requires care beyond that of a typical four-year-old. Based on the testimony of the independent witnesses, which is unrebutted, Mother cannot provide the level of care Skyler requires. It would be dangerous for the child to be in her care alone even for short periods of time because she does not have the capacity to recognize the dangers that he faces. There was no proof that she will ever obtain the necessary intellectual functioning to do this.

Acknowledging that "some of these findings are supported by the evidence," Mother nevertheless argues that the trial court erred in finding her mentally incompetent to care for the child.

Mother relates the instant case to *State Department of Children's Services v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430 (Tenn. Ct. App. May 30, 2002). There, the mother suffered a traumatic brain injury as a child, and had both significantly limited vision and a seizure disorder as an adult. *Id.* at \*1. The child similarly had a seizure disorder and other health concerns which required "many prescription medications to properly treat them including, but not limited to, breathing treatments for the asthma, creams for skin problems, and oral medications." *Id.* At trial, a psychologist testified that while the mother's visual impairment might not affect her ability to parent, her mild intellectual disability would prevent her from adapting to meet the challenges associated with raising a child. *Id.* at \*5–6. He testified that the mother would only be able to care for the child "[i]f she had 24/7 assistance. In other words, she would not be able to ever care for her son safely without assistance." *Id.* at \*6. The visitation supervisor testified that the mother initially needed to be encouraged to comfort the child or change his diaper, but she was eventually able to do these things without prompting. *Id.* The child's GAL opined that she had not noticed any change in the mother's ability to parent the child during the custodial period. *Id.* at \*7. The GAL was also concerned that the mother was unable to explain how she would care for the child during a medical emergency, other than to say that she would call the hospital. *Id.* The mother's vocational rehabilitation counselor

explained that the mother had taken full advantage of the services provided to assist her in learning to live independently despite her visual disability. *Id.* A friend of the mother's testified that she would be willing to allow the mother and the child to live with her, on the condition that the child remain in DCS custody for financial reasons. *Id.* at *8. The trial court found that the grounds of mental incompetence and persistent conditions supported terminating the mother's rights. *Id.*

On appeal, this Court determined that DCS has failed to provide clear and convincing evidence of either ground because, while the testimony regarding the mother's disabilities was uncontroverted, the concerns as to the mother's parenting ability were mostly theoretical. There was no proof that any effort was made to teach the mother how to properly medicate the child and that she was unable to do so. *Id.* at *12. The GAL never saw the mother interact with the child. *Id.* at *13. And as the mother had visitation for only one hour per week during the almost five-year custodial period, we concluded that it was not unreasonable for her to be unable to articulate the specifics of how she would care for the child. *Id.* The mother was able to live independently and had shown progress in caring for the child without prompting. *Id.* at *14. Moreover, and "[m]ost importantly, [the mother] has a friend who is a retired educator and foster parent willing to assist her in the parenting of the child." *Id.* In light of this assistance and the lack of proof as to the mother's actual ability to parent the child, we reversed the trial court's termination of the mother's rights, remanding the case to the trial court for investigation into placing the child with the mother's friend or otherwise increasing the mother's visitation. *Id.* at *15.

Mother argues that this case suffers from the same lack of evidence regarding her present parenting ability that proved dispositive in **Whaley**. First, she denies that the April 2021 assessment is sufficient proof of her parenting ability at or near the time of trial, three years later. As such, she argues that there was no expert proof of her present mental state or ability. And Mother argues that the visitation supervisor had neither any experience working with intellectually disabled parents nor any knowledge of the skills relevant to the child's needs. Thus, she denies that the testimony of the supervisor was credible proof of incompetence.

Of course, there is no requirement for DCS to establish Mother's mental incompetence through expert testimony. *See In re Katrina S.*, No. E2019-02015-COA-R3-PT, 2020 WL 5269236, at *11 (Tenn. Ct. App. Sept. 3, 2020) ("Mother points us to no authority, nor have we found any, that expressly requires expert proof in order to satisfy this ground. In fact, this Court has previously held that expert proof is not required in every case and that trial courts may rely on the admissions and testimony of the parent in evaluating a parent's mental competency."); *In re Shaneeque M.*, No. E2014-00795-COA-R3-PT, 2014 WL 6499972, at *9 (Tenn. Ct. App. Nov. 20, 2014) ("[E]xpert testimony on the effect of a parent's mental illness on his or her ability to parent a child is not required."). This Court is also reticent to overturn the trial court's findings as to witness credibility. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) ("[A]ppellate courts will

not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary."). We find no merit in Mother's argument that Ms. Henry's testimony should not be credited because she did not have specialized training in modeling parenting skills to a mentally disabled parent.[15] In his report, the psychological examiner expressly stated that "[a]ny parenting education should be through modeling[,]" which Ms. Henry testified was the fundamental purpose of her involvement in the visitation. Ms. Henry also testified that she attempted to model skills to Mother in multiple ways in order to accommodate her intellectual disability. There is no clear and convincing evidence to overturn the trial court's finding that Ms. Henry was "very credible."

In any event, Mother's own testimony established her present lack of parenting ability. *See In re Lorenda B.*, No. M2016-01841-COA-R3-PT, 2017 WL 1416858, at *10 (Tenn. Ct. App. Apr. 19, 2017) (explaining that the mother's testimony was "perhaps the most glaring evidence" of the impact of her mental condition on the child). Mother testified that her care for Michael showed that she was capable of caring for Skyler. However, although she shares custody of her older son with his grandfather, Michael does not live with Mother and instead lives with Ray or Little Angela. Mother also showed very little understanding of the extent of Skyer's autism, noting only that he had a lazy eye and does not speak. Similarly, Mother did not seem to understand the extent of her own limitations, as she showed no concern about her eventual release from the rehabilitation center to her own home, despite the fact that being in a wheelchair would deny her access to the upstairs bedrooms. This testimony supports the trial court's finding that Mother is unable to provide the heightened level of care needed by Skyler. *See In re Kamdyn H.*, 2024 WL 733317, at *13 (finding it significant that the mother did "not fully grasp the gravity of her mental illnesses or her dependency on" the assistance of others).

Mother also argues that, like in *Whaley*, the proof establishes that she is capable of caring for the child with help. She emphasizes that her intellectual disability does not prevent her from conducting her day-to-day activities, as, prior to the November 2023

---

[15] To the extent that Mother argues that Ms. Henry's lack of specialized training in instructing intellectually disabled parents amounts to a violation of the Americans with Disabilities Act ("the ADA"), it does not appear that she raised this argument in the trial court. *See Jackson v. Burrell*, 602 S.W.3d 340, 344 (Tenn. 2020) (noting that "a party may not raise an issue on appeal that was not raised in the trial court" (citations omitted)). Mother also fails to cite any caselaw to suggest that the ADA may somehow be used as a shield in parental rights termination proceedings. *See Sneed v. Bd. of Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."). Moreover, this Court has previously noted that "numerous state courts have rejected the proposition that the ADA is a defense to a termination of parental rights proceeding." *In re Kamdyn H.*, 2024 WL 733317, at *15 (citing *S.G. v. Barbour Cnty. Dep't of Hum. Res.*, 148 So.3d 439, 447 (Ala. Civ. App. 2013) ("Consistent with the majority of courts that have considered ADA challenges to termination-of-parental-rights proceedings, we hold that a termination-of-parental-rights proceeding is not a service, program, or activity within the meaning of the ADA and that, therefore, the ADA does not apply to such a proceeding.")).

accident, she was able to live wholly independently. And she highlights that the rights removed pursuant to the conservatorship do not relate to her ability to parent. Mother points to the testimony of Big Angela and Little Angela as showing that she would have assistance in caring for the child. Critically, Mother avers that the ground "does not require that she assumes care and responsibility independently and without help."

Yet we have previously dismissed the argument that a parent's ability to provide only "supervised care" should suffice for purposes of this ground. In *In re Samuel R.*, the children's mother and stepfather sought to terminate the parental rights of the father, who admitted to his general mental incompetence. 2018 WL 2203226, at *3. The father argued, however, that the children were receiving stable care from the mother and stepfather, such that an ability to independently care for the children was unnecessary. *Id.* at *8. This Court noted that "Tennessee courts have consistently held that '[a] parent's continued incapacity to provide fundamental care for a child, whether caused by mental illness, mental impairment, or some other cause constitutes sufficient ground for termination of parental rights.'" *Id.* at *9 (quoting *In re Eric G.*, No. E2017-00188-COA-R3-PT, 2017 WL 4844378, at *11 (Tenn. Ct. App. Oct. 25, 2017)). Thus, "the 'key' issue is whether an early return to the *care* of the parent is possible." *Id.* (citation omitted); *cf. In re Lillian D.*, No. E2016-00111-COA-R3-PT, 2016 WL 4505691, at *5 (Tenn. Ct. App. Aug. 26, 2016) (finding that the mother's successful supervised visitation was insufficient to avoid a finding of mental incompetence where unsupervised visitation was not recommended); *In re B.L.S.C.*, No. M2008-02301-COA-R3-PT, 2009 WL 971286, at *8 (Tenn. Ct. App. Apr. 7, 2009) (finding a mother's behavior during supervised visitation commendable, but unable to "negate the clear and convincing evidence that [she] cannot consistently care for her children in an unsupervised, unstructured setting").

Moreover, assuming, arguendo, that the provision of supervised care is all that the ground requires, it is unclear whether Mother's involvement with the child could rise to that level. The visitation supervisor explained that, despite more than one year of weekly visitation under her instruction, Mother was still unable to perform parenting tasks without prompting. Ms. Henry testified that she had instructed Mother regarding the need to keep the child from running away or putting things in his mouth and yet Mother could not effectively do so. This led to the child putting his hand in his diaper and then in his mouth on more than one occasion. Mother also required repeated coaching about parenting skills, both from one visit to the next and within the same visit. As such, Ms. Henry did not believe that Mother was gaining any long-term benefit from the supervised visitation or that Mother could safely be left alone with the child for any period of time.

Although Mother attempts to discredit the results from the parenting assessment as not representative of her parenting ability at the time of trial, she has not made any argument that her mental condition has improved during the custodial period so as to render

- 14 -

the report inaccurate.[16] *Contra* **In re Jayda J.**, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at \*7 (Tenn. Ct. App. July 21, 2021) (putting little credence in a psychological evaluation conducted two years prior to trial when there was testimony that the mother "had made significant progress in her ability to parent"). Ultimately, the examiner recommended that Mother and the child move in with Little Angela full-time, as Mother did not "appear capable of parenting independently due to cognitive limitations and emotional instability." Yet, Mr. Proffitt did not describe this live-in caretaker situation as Mother parenting the child with the benefit of occasional assistance. Instead, he opined that the arrangement would allow Mother merely to "remain a presence in her children's lives" and "maintain[] elements of the maternal bond[,]" while ensuring that the child still received "stability and adequate supervision[.]"

Additionally, both Big Angela and Little Angela were hesitant to leave Mother alone with the child other than for short periods. While they had different ideas as to the person for the role, they both believed that the best course of action would be to have Mother and the child live with someone else full-time. Mother herself recognized that she would need "a lot" of help with the child, but she denied any intent to live with Little Angela or anyone else to have full-time assistance with the child. And yet none of the women seemed aware of the full extent of the child's needs, making their testimony all the less compelling. The evidence, therefore, does not preponderate against the trial court's finding that Mother does not have the present ability to adequately care for the child, even with the offered help. And Mother's lack of improved understanding of the parenting skills modeled by Ms. Henry each week indicates that this inability is unlikely to be remedied in the near future. *See* **In re Khalil J.**, No. M2021-00908-COA-R3-PT, 2022 WL 1537396, at \*13 (Tenn. Ct. App. May 16, 2022) (finding expert testimony "that both parents would need continuous parenting instruction during each phase of the child's entire life to be able to parent him through changing developmental stages" relevant to the question of the parents' present and future ability to care for the child).

In our view, the circumstances of this case align more closely with those present in **In re Dorothy A.**, No. M2023-01511-COA-R3-PT, 2024 WL 5196583 (Tenn. Ct. App. Dec. 23, 2024). There, both of the parents suffered from intellectual disabilities, with a psychologist testifying that the father would likely not be capable of responding to novel situations or crises and the mother could not attend to even the daily needs of the children. *Id.* at \*8. The children also suffered from a genetic disorder that caused kidney problems and delays in language and motor skills. *Id.* at \*9. The children initially needed a significant amount of therapy; the older child "had made notable progress" by the time of trial and no longer needed therapy, but the younger child was non-verbal and still required numerous regular sessions. *Id.* The parents received training as to standard parenting skills and the

---

[16] Of note, also, is that the examination was conducted prior to the child's autism diagnosis and the revelation of his resulting specialized needs, which arguably renders the examiner's findings that Mother is incapable of parenting the child especially significant.

more specialized skills required to help the children with their particular needs. *Id.* at *10. The DCS caseworker testified that the parents' disabilities were considered in customizing the services provided to them, but that "after considerable instruction," the parents were still unable to care for the children. *Id.* at *11. The father was eventually able to perform some skills, but not on a consistent basis; the mother was not able to perform any of the tasks even with assistance. *Id.* at *10. As such, the supervisor of this training "observed that although the parents loved the [c]hildren, they were simply unable to consistently demonstrate proper parenting skills." The training director also reported that "the parents would need 'quite a bit of support' to parent the [c]hildren, explaining that this supervision and support would need to be '24/7.'" *Id.* Based on the mother's lower level of cognitive functioning and emotional instability, a second psychologist testified that she "would need constant supervision when present with the [c]hildren." *Id.* Among other grounds, the parents' rights were terminated on the basis of mental incompetence. *Id.* at *2.

This Court looked to the testimony of the two psychologists as proof that the parents could not presently care for the children based on their respective mental impairments. *Id.* at *12. The parents' lack of improved performance of the modeled parenting skills established that this inability was unlikely to be resolved in the near future. *Id.* It is the same here. Mr. Proffitt reported that Mother's intellectual disability prevented her from adequately parenting the child. Ms. Henry testified that Mother has not made any improvement in her ability to perform modeled parenting skills consistently, without prompting, or, in some cases, at all. The general consensus of Mr. Proffitt, Ms. Henry, Big Angela, Little Angela, and Mother herself is that she would not be able to care for the child without near-constant supervision.

From all of the testimony at trial, it appears that returning the child to Mother's custody would result in his being fully cared for by some other person while Mother enjoys what would essentially be in-home visitation. Despite Mother's contention otherwise, this simply does not compare to the assistance Foster Parents receive from the other two members of the child's "core four." It certainly does not satisfy the statutory requirement that Mother be able to safely care for the child. *See State Dep't of Child.'s Servs. v. D.G.B.*, No. E2001-02426-COA-R3-JV, 2002 WL 31014838, at *9 (Tenn. Ct. App. Sept. 10, 2002) ("The legislative intent is not simply to establish a 'meaningful relationship' between a child and his or her parents; it is much more than that. It is to return the child to the *care* of his parents."); *State, Dep't of Child.'s Servs. v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008) ("[T]he evidence in this case, including the testimony of . . . Father himself, makes it clear that the 'assistance' needed to ensure that these children received proper care would have to, in effect, be a substitute parent, with Father acting only as a caring but incompetent bystander. These children need and deserve a parent who can take care of them."). Accordingly, we affirm the trial court's finding that the ground of mental incompetence supports the termination of Mother's parental rights.

## 2. Persistent Conditions

The next ground for termination at issue on appeal is commonly known as "persistent conditions." This ground applies when:

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3).

Mother argues that this ground is not applicable in this case because the child was removed prior to the filing of any dependency and neglect allegations and the child was never actually found to be dependent and neglected by the juvenile court. Indeed, "[t]he necessary order of removal is 'the threshold consideration' for this ground." *In re Lucas S.*, No. M2019-01969-COA-R3-PT, 2021 WL 710841, at *4 (Tenn. Ct. App. Feb. 24, 2021) (quoting *In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015)).

Previously, the ground of persistent conditions was only applicable when the child was "removed *from the home* of the parent or guardian *by order of a court* for a period of six (6) months[.]" Tenn. Code Ann. § 36-1-113(g)(3) (2017) (emphasis added). This was interpreted by Tennessee courts as requiring the child to have been removed from the parent's home based on a finding of dependency and neglect. *See In re Elijah R.*, No. E2020-01520-COA-R3-PT, 2021 WL 2530644, at *9 (Tenn. Ct. App. June 21, 2021) (citing *In re Audrey S.*, 182 S.W.3d at 874; *In re Kandace D.*, No. E2017-00830-COA-R3-PT, 2018 WL 324452, at *6 (Tenn. Ct. App. Jan. 8, 2018)). Following an amendment in 2018, however, this threshold consideration is satisfied when the child is removed from

- 17 -

either the home, physical custody, or legal custody of the parent by a court order. *See In re Savannah M.*, No. M2018-00752-COA-R3-PT, 2019 WL 354869, at *5 n.12 (Tenn. Ct. App. Jan. 28, 2019) (describing the amendment to the ground as "expanding its reach"). The amendment also obviates the need for a final order adjudicating the child dependent and neglected, as the relevant removal order can be entered at any point during a dependency and neglect proceeding. *See In re Braden K.*, No. M2020-00569-COA-R3-PT, 2020 WL 5823344, at *9 n.9 (Tenn. Ct. App. Sept. 30, 2020) (noting that, under the amendment, "the juvenile court order that removed the child from custody need not be final in order for persistence of conditions to be established").

The effect of this amendment was pertinent in *In re Disnie P.*, where the child had been placed with a family member prior to DCS's filing of a dependency and neglect petition. 2023 WL 2396557, at *2. As such, the child had not been removed from the mother's home or physical custody in the course of dependency and neglect proceedings. This Court found the persistent conditions ground could still support the termination of the mother's parental rights, however, because the trial court awarded the family member legal custody of the child after the petition alleging dependency and neglect had been filed. *Id.* at *11; *see also In re Jaylynn J.*, No. M2023-01496-COA-R3-PT, 2024 WL 2933349, at *9 (Tenn. Ct. App. June 11, 2024) (applying the same analysis).

Here, the child was removed from Mother's home and physical custody on September 11, 2020, based on DCS's concern for the child's immediate safety. DCS alleged that the child was dependent and neglected in its petition for custody filed September 15, 2020. The juvenile court entered an emergency protective custody order the same day, awarding DCS legal custody of the child. Thus, the child was removed from Mother's legal custody by order of the juvenile court in the course of proceedings in which allegations of dependency and neglect had been raised. And the child had been removed from Mother's legal custody for more than six months at the time the termination petition was heard in April 2024. The threshold consideration for this ground has been satisfied. The remaining questions are (1) whether conditions persist that prevent the safe return of the child, (2) whether the conditions will likely be remedied at an early date, and (3) whether the continued relationship prevents early integration of the child into a safe, stable, permanent home.

The purpose of the persistent conditions ground for termination is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Navada N.*, 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). As we have previously explained,

> "A parent's continued inability to provide fundamental care to a child, even
> if not willful, . . . constitutes a condition which prevents the safe return of the

- 18 -

child to the parent's care." ***In re A.R.***, [] 2008 WL 4613576, at *20 [] (citing ***In re T.S. & M.S.***, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. ***In re T.S. & M.S.***, 2000 WL 964775, at *6 (citing ***State Dep't of Human Servs. v. Smith***, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion . . . that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." ***Id.***

***Id.*** at 605–06. Accordingly, "[t]his ground for termination focuses on the *results* of the parent's efforts at improvement rather than the mere fact that he or she has made them." ***In re Allison S.***, No. E2023-01072-COA-R3-PT, 2024 WL 2050502, at *9 (Tenn. Ct. App. May 8, 2024) (quoting ***In re Edward R.***, No. M2019-01263-COA-R3-PT, 2020 WL 6538819, at *17 (Tenn. Ct. App. Nov. 6, 2020)). Moreover, as DCS points out, this statutory ground also applies when conditions other than those for which the child was removed "exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian." Tenn. Code Ann. § 36-1-113(g)(3)(A)(i); *see, e.g.*, ***In the Matter of S.Y., J.Y., & D.Y.***, 121 S.W.3d 358, 370–71 (affirming the trial court's finding of persistent conditions where the mother had corrected certain immediate conditions leading to the children's removal but had failed to address underlying "other conditions" that were reasonably probable to lead to the children living in a condition of neglect similar to that prompting their removal if they were returned to the mother).

In the September 2020 dependency and neglect petition, DCS stated that there was no less drastic alternative than removing the child from Mother's care, based on "concerns of the child being inappropriately supervised by [M]other, the history of domestic violence between [M]other and [Artwell,] and not knowing [M]other's current whereabouts[.]" While Mother's whereabouts were no longer a concern at trial, the trial court found that the issues of inadequate supervision and an inappropriate relationship persisted. The trial court found that Mother's physical state at the time of trial was another condition that would prevent the child's safe return. The trial court concluded that these conditions were unlikely to be remedied at an early date, if ever, and that continuing the parent-child relationship would prevent the child from obtaining permanence through adoption.

Mother argues that there is no proof of the conditions that actually existed at the time of removal or that she has an on-going relationship with Artwell beyond the testimony of Foster Mother. However, Mother failed to provide any evidence to rebut Foster Mother's testimony regarding the child's state when removed from Mother's care. And although Mother testified that she was no longer in contact with Artwell, the trial court specifically credited Foster Mother's testimony to the contrary. *See* ***Wells***, 9 S.W.3d at 783.

- 19 -

Moreover, as discussed, *supra*, the evidence supports the trial court's finding that Mother remains unable to adequately care for the child due to her intellectual disability. *See **In re B.S.G.***, No. E2006-02314-COA-R3-PT, 2007 WL 1514958, at \*7 (Tenn. Ct. App. May 24, 2007) ("A parent's mental incapacity can provide a sufficient factual predicate for a finding that persistent unremedied conditions exist which prevent the safe return of the child or children to that parent's care."). As further discussed, *supra*, based on Mother's lack of progress with the parenting skills modeled during visitation, it is unlikely that Mother's mental incompetence will be remedied at an early date to allow for the safe return of the child. *See **In re T.S. & M.S.***, 2000 WL 964775, at \*6.

Additionally, at the time of trial, Mother was using a wheelchair, living in a rehabilitation center, and unable to independently bathe or use the bathroom. In light of the child's escapist proclivities, the child's therapist testified that it is "very important" for his caregiver to be mobile. Thus, Mother's physical limitations, in all reasonable probability, would result in further harm to the child. Mother was unsure how long she would need to remain in either the rehabilitation center or the wheelchair. This similarly prevents a conclusion that this condition will be remedied at an early date.

As it is likely that Mother will never be able to successfully parent the child, and it is likely that the child will never be able to live independently, it is also likely that continuing the parent-child relationship will prevent the child's early integration into a safe and stable home. Foster Parents testified to their desire to adopt the child and to significant changes they have made to their lives and home to accommodate Skyler's needs. They further described their intent to allow Mother to remain a part of the child's life. Continuing the parent-child relationship, therefore, prevents the child's early integration into a permanent home. Accordingly, we affirm the trial court's finding that the ground of persistent conditions supports the termination of Mother's parental rights.

### 3. Failure to Manifest an Ability and Willingness

The trial court also determined that Mother failed to manifest an ability and willingness to assume custody or financial responsibility of the child under Tennessee Code Annotated section 36-1-113(g)(14). Parental rights may be terminated under this section when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). The ground contains two distinct elements that must be proven by clear and convincing evidence. The first requires proof that the parent has failed to evince *either* an ability *or* a willingness to assume custody of the child. ***In re Neveah M.***, 614 S.W.3d 659, 677 (Tenn. 2020). Our analysis of a parent's ability "focuses on the parent's lifestyle and circumstances," while willingness involves the parent's attempts "to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." ***In re Cynthia P.***, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019) (citations omitted).

The second element requires proof that placing the child in the parent's custody poses "a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). Although "risk of substantial harm" is not defined by the statute, this Court has provided examples of situations resulting in such a risk, including "forcing a child to begin visitation with a near-stranger," "placing a child with a parent who engaged in repeated criminal conduct that required incarceration," or returning a child to "parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence[.]" ***In re Brianna B.***, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) (collecting cases).

Throughout this case, Mother's willingness to assume custody of the child has never been questioned. It is very clear that Mother loves her son and would like to have him returned to her care. It is similarly clear, however, that Mother is not able to assume that responsibility. Mother has been unable to internalize important parenting skills like preventing the child from running off or putting things in his mouth, despite repeated instruction. Mother's use of a wheelchair at the time of trial, and the uncertainty of her recovery, would inhibit the mobility deemed "very important" to the child's safety.

As to the effect of placing the child in Mother's custody, we look to Ms. James's testimony that Skyler's behavior worsened after visitation required him to miss therapy. Ms. James also testified to the strong correlation between the child's progress with self-regulation and motor skills and the cessation of visitation due to Mother's accident. Furthermore, Foster Mother and Ms. James testified that removing the child from Foster Parents' home would have serious negative consequences, based on his attachment to them and his general intolerance for change. Thus, returning the child to Mother's care would pose a substantial risk to both the child's physical safety and psychological well-being. Accordingly, we affirm the trial court's finding that the ground of failure to manifest an ability and willingness supports the termination of Mother's parental rights.

### B. Best Interest

Because we have determined that at least one statutory ground for terminating Mother's parental rights has been proven, we must now decide if DCS has proven, by clear and convincing evidence, that termination of Mother's rights is in the child's best interest.

Tenn. Code Ann. § 36-1-113(c); **White v. Moody**, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When the termination petition was filed on April 8, 2021, the statute contained a non-exclusive list of nine best interest factors. *See* Tenn. Code Ann. § 36-1-113(i) (effective March 6, 2020 to April 21, 2021). Shortly after the filing of the petition, however, the statute was amended to include a total of twenty non-exclusive best interest factors. *See* Tenn. Code Ann. § 36-1-113(i) (effective April 22, 2021). We have previously emphasized that "the amended statute applies only to petitions for termination filed on or after April 22, 2021." **In re Riley S.**, No. M2020-01602-COA-R3-PT, 2022 WL 128482, at *14 n.10 (Tenn. Ct. App. Jan. 14, 2022). In its termination order, however, the trial court relied on the newer factors.

The use of the updated factors is not, by itself, reversible error. *See* **In re Clara A.**, No. E2022-00552-COA-R3-PT, 2023 WL 1433624, at *8 (Tenn. Ct. App. Feb. 1, 2023) ("[T]his Court has held that a trial court's reliance on the newer factors is not generally reversible error 'because the old factors are essentially contained within the new factors.'" (quoting **In re Bralynn A.**, No. M2021-01188-COA-R3-PT, 2022 WL 2826850, at *9 (Tenn. Ct. App. July 20, 2022))). "Because the statutory factors are not exclusive, regardless of which version of the statute is applicable, if the trial court's findings are sufficient to allow us to 'make a meaningful review' of its best-interest determination, then remand is unnecessary." **In re Nation F.**, No. W2023-00510-COA-R3-PT, 2024 WL 277960, at *6 (Tenn. Ct. App. Jan. 25, 2024) (citing **In re Mitchell B.**, No. M2022-01285-COA-R3-PT, 2023 WL 3619561, at *6 (Tenn. Ct. App. May 24, 2023)).

The focus of Mother's best interest argument is not that the trial court erred in considering the newer factors, but that the application of the amended best interest factors does not support terminating her parental rights. Alternatively, Mother argues that the trial court did not make sufficient findings to allow for meaningful review. DCS does not take issue with the trial court's use of the newer factors and denies both arguments posed by Mother. As we conclude that the trial court's order included sufficient analysis of the child's best interest to permit meaningful review on the merits, we "follow Mother's lead to consider the best interest factors that Mother asserts are controlling in this case." **In re Bralynn A.**, 2022 WL 2826850, at *9.

In considering whether termination of parental rights is in the best interest of the child, courts are directed to "consider all relevant and child-centered factors applicable to the particular case before the court." Tenn. Code Ann. § 36-1-113. Under the updated version of section 36-1-113, this review may include the following non-exclusive factors:

> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

- 22 -

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to

creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d at 667 (citations omitted). As such, determining a child's best interest does not entail simply conducting "a rote examination" of each factor and then totaling the number of factors that weigh for or against termination. *In re Audrey S.*, 182 S.W.3d at 878. Instead, the "relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* (citing *White*, 171 S.W.3d at 194). In considering the statutory factors, "courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting *In re Audrey S.*, 182 S.W.3d at 878).

Here, the trial court found fifteen factors—(A), (B), (C), (D), (H), (I), (J), (K), (L), (M), (N), (O), (P), (Q), and (T)— weighed in favor of termination and one factor—(E)— weighed against termination.[17] As "there exists a significant overlap between some factors," our review of the child's best interest is "based on the overarching themes within the list of twenty factors." *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

We turn first to those factors related to the children's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the child's need for stability), (B) (involving the effect of a change in caretakers on the child's wellbeing), (D) (involving the security of the parent-child attachments), (E) (involving visitation), (H) (involving the child's attachment to another parent-figure), (I) (involving the child's relationships with others), (T) (involving the effect of the parent's mental and emotional fitness on the child). There was no testimony that Mother ever missed visitation, which weighs against termination. However, Ms. James testified that visitation with Mother disrupted the child's routine, leading to poor behavior during therapy. Ms. James also

---

[17] Three of the remaining four factors, (F), (G), and (R), primarily relate to the parent's home; the trial court did not discuss these factors, likely because the child has never been to Mother's current residence. Factor (S), relating to financial support, was also not discussed at trial or in the trial court's order. We will nevertheless discuss these factors as relevant.

testified that the child made noticeable progress after Mother was unable to visit following her injury. This raises concerns regarding the benefit of this continued visitation. *Cf.* ***In re Harley K.***, No. E2021-00748-COA-R3-PT, 2022 WL 1154140, at *11 (Tenn. Ct. App. Apr. 19, 2022) (noting that the visitation factor favored termination where the visits that the parent did have with the child negatively impacted the child's mental health and behavior); ***In re Antonio J.***, No. M2019-00255-COA-R3-PT, 2019 WL 6312951 (Tenn. Ct. App. Nov. 25, 2019) (affirming a trial court's finding that the detrimental effects of a change in caretakers favored termination where a child regressed in his potty training after beginning therapeutic visitation with the mother). While Ms. Henry acknowledged that there is a bond between Mother and the child, she noted that this bond is not markedly stronger than the child's bond to herself or as strong as his bond with Foster Parents. At the time of trial, the child was around four years old; he has been placed with Foster Parents since he was approximately three months old. Based on the child's enhanced need for stability, Foster Mother testified that removing the child from Foster Parents' home would be "devastating" to him. Similarly, Ms. James testified that this change in custody would be "extremely traumatic" and would likely cause regression in the child's progress in therapy. Foster Parents have demonstrated their ability and willingness to meet all of the child's significant needs. And again, Mother's intellectual disability prevents her from being able to provide the heightened level of care that the child requires without constant assistance and supervision. On the whole, these factors weigh in favor of termination.

Next, we address those factors involving the physical environment of the child and the parent. *See* Tenn. Code Ann. § 36-1-113(i)(F) (involving the child's fear of the parent's home), (G) (involving whether the child's trauma is triggered by being in the parent's home), (N) (involving any abuse or neglect present in the parent's home), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the child's needs), (R) (involving the health and safety of the home). Like the trial court, we find it difficult to discuss several of these factors, as the child was removed from Mother's care at such a young age, Mother has obtained new housing during the custodial period, and there was little discussion of the state of Mother's current home at trial. Depending on the circumstances, this Court has classified a ground for which there was a lack of evidence as, variously, weighing against termination, being neutral, or being inapplicable. *See* ***In re Colten B.***, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *9–10 (Tenn. Ct. App. Jan. 21, 2025) (including a thorough discussion of the approaches taken in similar situations). Still, a factor that is merely neutral or inapplicable cannot be said to weigh in favor of termination. Thus, DCS has failed to demonstrate that factors (F), (G),[18] and (R) weigh in favor of termination.

Similarly, although the trial court credited Foster Mother's testimony that Mother

---

[18] We note that while Ms. James testified that the child would be traumatized by a change in custody, this seems more to do with the child's intolerance for any disruption in his routine in general and less to do with Mother's home in particular.

- 25 -

was still in communication with Artwell despite his history of domestic violence, the testimony revealed that Artwell was still in prison at the time of trial. Thus, there was no proof of any current abuse in Mother's home based on her continued relationship with Artwell. However, this case began based on DCS's concern that the child was being neglected after receiving a report that the child had been given spoiled milk and was not being properly supervised. And the testimony revealed that Mother has not provided safe and stable care to any of her older three children. Mother does not have custody of her two daughters, and though she shares custody of her son Michael, she is not his primary caregiver. Indeed, Michael lives with either Ray or Little Angela, who homeschools him. There was also little to suggest Mother's commitment to having a home that can meet the child's needs, as she has no plans to make the home accessible for herself following her eventual release from the rehabilitation center and simply stated that Skyler would have to stay with Little Angela until she recovered. So factors (N), (O), and (Q) weigh in favor of termination.

We turn to those factors concerning the efforts made by the parent. *See* Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (L) (involving DCS's reasonable efforts), (M) (involving the parent's sense of urgency), (P) (involving the parent's understanding of the child's basic needs). The trial court found that all of these factors favored termination. We note that the trial court found factor (K) to support termination because "Mother has taken advantage of available programs, but they failed to help her make a lasting adjustment of circumstances, conduct, or conditions." We agree that Mother's continued participation in supervised visitation indicates an attempt to make use of DCS's efforts, and as this factor looks more to Mother's efforts than the results of those efforts, factor (K) does not weigh in favor of termination. However, despite reasonable efforts by DCS,[19] very little has changed for the better during the custodial period in terms of Mother's circumstances or ability to understand and meet the child's needs. We also cannot say that there was any indication of a sense of urgency in addressing these circumstances. To be sure, the child was removed from Mother's custody at a very young age due to DCS's concern that he was not receiving adequate supervision. As discussed, this concern persists regardless of Mother's use of the available resources, based on Mother's continued lack of progress despite repeated direction regarding general parenting skills and the child's specific needs during supervised visitation. Nor was there credible testimony to evince any lasting effort to remedy DCS's concern over domestic violence in Mother's relationship with Artwell. Overall then, factors

---

[19] Mother again questions whether the efforts provided by DCS were reasonable, as she did not receive the same specialized training as Foster Parents and Ms. Henry was not experienced in modeling parenting skills to intellectually disabled parents. Yet the instructions Mother did receive were in the form suggested by Mr. Proffitt to best accommodate her disability, and there was no proof that she benefited from this simple training. It is difficult, then, to say that Mother would have been more successful if presented with the more in-depth training received by Foster Parents. DCS's efforts were therefore reasonable under the circumstances.

(C), (J), (L), (M), and (P) support termination.

The final factor involves "[w]hether the parent has consistently provided more than token support for the child[.]" Tenn. Code Ann. § 36-1-113(i)(S). No evidence was presented at trial regarding Mother's provision of financial support. Accordingly, DCS has not demonstrated that this factor weighs in favor of termination.

From our review, fifteen out of twenty factors favor termination. While this Court has no doubt that Mother loves the child and would like to be able to care for him, our focus is not on Mother and her desires. Instead, we must consider Skyler and what is best for him in light of our conclusion that clear and convincing evidence supports the trial court's finding that Mother is not mentally competent to care and provide for him. In a similar situation, we have explained:

> [T]he statutes on termination of parental rights are established not only to protect a child from a parent who actively abuses him, but also to avoid the harm visited upon a child by spending years in the uncertainty of foster care because his biological parents are unwilling or unable to care for him properly, and yet will not voluntarily relinquish their parental rights so that the child will be available for adoption and a permanent home. Such parents may recognize that they are unable to shoulder the responsibility of caring for the child, but wish for a relationship with the child that does not require caring for the child's needs. The statutory scheme enacted evidences recognition by the Legislature that, unless the parental rights of such a parent can be terminated, a substantial number of children will spend their childhood in foster care, with no possibility of a permanent home.

*In re D.W.M., Jr.*, No. E2013-02017-COA-R3-PT, 2014 WL 2025164, at *16 (Tenn. Ct. App. May 13, 2014) (quoting *State Dep't of Child.'s Servs. v. Oliver*, No. M2007-00844-COA-R3-PT, 2007 WL 4553036, at *9 (Tenn. Ct. App. Dec. 26, 2007)). There, this Court determined that the grounds of mental incompetence and persistent conditions supported the termination of the parents' rights. *Id.* at *15. In considering the child's best interest, we acknowledged that the parents "made substantial efforts" to comply with DCS requirements and maintain a relationship with their child. *Id.* at *16. Yet, the parents' mental disabilities prevented them from effectively caring for the child and "[n]one of the arguments offered by [the parents] on best interest change the fact that neither of them is— or will be—competent to take custody of the child." *Id.* at *17. As such, continuing the child's relationship with the parents would only serve to prevent his adoption and ensure that he spent his childhood in foster care, without a permanent home, which would be "substantial harm indeed." *Id.* (quoting *Oliver*, 2007 WL 4553036, at *10). It is the same here. Overall, we must conclude that the evidence in the record supports the trial court's determination that terminating Mother's parental rights is in the child's best interest.

## IV. CONCLUSION

The judgment of the Davidson County Circuit Court is affirmed, and this matter is remanded to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellant Loren M., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE